ALEX SPIRO, ESQ.
Brafman & Associates, P.C.
767 Third Avenue, 26th Fl
New York, NY 10017
Phone: (212)-750-7800
Fax: (212)-750-3906

BRIAN MICHAELS, OSB # 925607
259 East Fifth Avenue, Suite 300-D
Eugene, Oregon 97401
Telephone: 541.687.0578
Fax: 541.686.2137
brian@brianmichaelslaw.com
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| DOMINIC ARTIS and DAMYEAN DOTSON, | ) Case No. 16-CV-647 ) |
| Plaintiffs, | ) ) PLAINTIFFS' SUPPLEMENTAL |
| v. | ) MEMORANDUM ) ) |
| UNIVERSITY OF OREGON; SANDY WEINTRAUB; CHICORA MARTIN; ROBIN HOLMES; and MICHAEL R. GOTTFREDSON, all in their individual capacities only, | ) ) ) ) ) ) |
| Defendants. | ) ) ) |

**INTRODUCTION**

On August 9, 2016, this Court heard oral argument on defendant's motion to dismiss in Austin et al, v University of Oregon et al, Case No. 6:16-CV-00647-MC.  Initially, I thank the Court for allowing me to participate remotely, despite every effort to be present, and further thank the Court for the opportunity of a written response.

Echoing co-counsel's arguments, not all facts were available to Plaintiffs at the pleading stage, largely due to the secrecy within which universities operate.  However, at this stage there are sufficient facts pleaded to meet the standards articulated in Doe v. Columbia, 2016 U.S. App. LEXIS 13773 (2d Cir. N.Y., July 29 2016), and applicable federal law.  By allowing this suit to move forward, Plaintiffs will be able to undertake the necessary discovery to later prove the counts in their complaint. Specifically, Plaintiffs have stated a claim sufficient under federal law[1] because, **first,** Plaintiffs have a recognized property interest in their status as admitted University students, on scholarship, in good standing; **second,** Defendants deprived Plaintiffs of the due process to which they were lawfully entitled; and **third,** the lack of information makes this case appropriate to proceed to discovery.

**ARGUMENT**

**I.**

**The Plaintiffs Have a Property and Liberty Interest in Their Education Coupled With Their Scholarship and Its Benefits.**

Due to the recent vintage of the "Dear Colleague" letter that sparked schools' undertaking this process which they clearly are unequipped to handle, few federal courts have had an opportunity to interpret its devastating consequences.[2]   Indeed, it may take the prominent

---

[1] We believe there to be little doubt that the complaint sufficiently pleads Title IX and statutory claims and thus we focus primarily on the due process argument.

[2] In October 2010, the Office of Civil Rights issued a "Dear Colleague" letter on sexual harassment, thereby only allowing a few courts to weigh in on the issue since that time.

2

student athlete, whose livelihood is so tied to his ability to proceed at school, to garner enough interest for the issues to be explored and fully litigated.

Plaintiffs, who were playing and working for the University, had a tangible property interest inherent in their scholarship, with financial benefits and a likely NBA career well within their grasps.³  It included the price and benefit of four (4) years of higher education, room, board, including all meals, access to facilities and programs, along with medical treatment, and a stipend.  Accordingly, these tangible benefits amount to as much a property interest as the medical residency identified in <u>Stretten v. Wadesworth Veterans Hospital</u>, 537 F2d 361 (9th Cir. 1976).  Indeed, there are more medical residents working for a university than the five (5) starting players of the University's basketball team.  The prestige of this University promises at least a possibility of securing a career in the chosen field as a medical residency.⁴  The privilege of being a starting player at the University created a pathway to a multi-million dollar career in the NBA.

Furthermore, the argument that the student who finds himself excelling at physics, or the cello, might have a similar future-based interest proves unpersuasive.  Students who excel at the arts or sciences are viewed differently.  Schools consider different admissions factors, vary students' scholarships, while, more importantly, the success of these students in an ultimate career is more speculative than these three students who have the specific and rare opportunity to

---

³ By way of background, college athletes' property and liberty rights in continuing their education has evolved from the seminal 5th Circuit case of <u>Dixon v. Alabama State Board of Education</u>, 294 F.2d 150 (5th Cir. 1961), which recognized that substantive right at a critical and profound time.  Without equating the emerging crusade against male students on college campuses with the far greater plight African Americans have faced in this county, there are certain parallels that bear emphasis.  Put simply, just as in <u>Dixon</u>, the boys had a right to remain at a public institution of higher learning where they were students of good standing.

⁴ In 2015, The University of Oregon was ranked the nation's number two (2) seeded college basketball team in the PAC 10.  http://www.espn.com/mens-college-basketball/conferences/standings/_/id/21/year/2015/pac-12-conference. Last visited August 11, 2016.

be three (3) of only five (5) starting players on the basketball team. Such selection by the university is tantamount to acknowledging a professional career. These boys' scholarships ensure their livelihood after college.

In closing on this subject, as an attorney for the NBA who has represented a great number of players and had the opportunity to be around the league, I have witnessed the dedication that players possess to excel in this athletic career choice. Without doubt, their dreams of entering the NBA advanced considerably through this scholarship, bringing those dreams for these boys well within arm's reach. To deny the rare accolade of a scholarship as a property interest is at best disingenuous and to further snatch that dream away without any due process is devastating. These actions demand that these boys be enabled uncover and discover what processes, investigations, and reasonings the University undertook before eviscerating the careers they prepared for their whole lives to achieve.

## II.

**The Defendants Deprived Plaintiffs of Their Liberty and Property Interests by Subjecting Them to a Fundamentally Unfair Proceeding.**

The boys' attorneys sought to ensure a fair hearing from the University, repeatedly requesting to subpoena witnesses and other safeguards. Rather than providing such equitable process, the University left the boys no choice but to acquiesce to the administrative panel with the illusory promise of no expulsion. The fact remains, as pleaded in the complaint, that the boys were not given a fair opportunity to be heard before their *de facto* expulsion.

Initially, it is worth looking at the bigger picture of three (3) inner-city black, fatherless teenagers showing up at the University with the chance to succeed in the nation's number two (2) seeded college basketball team. Seated across the table from these boys are prominent, middle-aged, Caucasian administrators who have defamed them publicly before **any** process, let alone

the legally required process that was due.  It is not that this singular, albeit significant, fact proves a conspiracy, direct animus, or anything close, but it does make one wonder.

This dichotomy is well illustrated and documented in this case, where the boys were given no choice but to settle after three weeks of deficient negotiations.  This culminated in Mr. Austin finally signing the "special choice form" on June 3, 2014.  The series of events leading up to June 3, 2014 between the University and the boys are outlined below because counsel for the University presented this Court with a narrative so incomplete and misleading, it simply necessitates a response.

On May 13, 2014, Laura Fine, counsel for Brandon Austin, emailed the University of Oregon requested a hearing that complied with the requirements of ORS 351.088 and ORS 183.413 - .497 and.502" (The "contested case" requirements).  Ms. Fine noted that to be consistent with the statute, procedures must include: (a) representation by counsel (ORS 183.417(1)); (b) testimony of witnesses under oath (ORS 183.417(7)); (c) depositions (ORS 183.425); (d) issuance of subpoenas on behalf of a party (ORS 183.440); (e) cross-examination of witnesses (ORS 183.450(3)); and (f) judicial review (ORS 183.480).[5]

That same day, on behalf of Mr. Artis, attorney Greg Veralrud wrote to the University requesting issuance of a long list of *subpoenas duces tecum* with an explanation as to why they were imperative.[6]  On May 22, Veralrud wrote to the University to begin settlement talks and asked, "Has the university subpoenaed those witnesses set forth in my request last week? If not, will it be done if we go forward?"[7]

On May 23, counsel to the University, Doug Park, emailed a proposal that began, "If the accused students (Dominic, Austin and Damyean) all agree to waive the panel hearing currently

---

[5] See Exhibit A.
[6] See Exhibit B.
[7] See Exhibit C.

set for May 30 and instead submit their cases to an administrative conference, the UO will agree to the following."[8] Ms. Fine immediately responded: "On May 13, I sent you a letter requesting a contested case hearing for Brandon Austin. I supplemented that request with additional justifications on May 15. Notwithstanding the fact that we are engaged in settlement negotiations, can you provide a response to my request?"[9] Park responded: "…[i]f the case proceeds through a panel hearing, the procedures used at the hearing will be those outlined in the "panel hearings" sections of the student conduct code: OAR 571 Division 21. Those administrative rules were properly passed through the formal rulemaking procedures contained in ORS Chap. 183 and are therefore presumptively valid. The panel hearings rules outlined in the student conduct code are not identical to the contested case hearing rules outlined in OAR Chap. 183, although they are similar."[10] Fine's response included, "You may have never issued subpoenas before, but the law contemplates it and the fact that you haven't done it before is not a justification for failing to do it now. Without compelling attendance of our witnesses, our clients will be denied a fair hearing."[11]

On May 26, Mr. Veralrud emailed Park, noting that he was objecting to the hearings on behalf of all three students and emphasizing his continued request that the University exercise its subpoena power: "…[] I presume the University retains that power while an accused has none because the university is expected to proceed in fairness and is expected to put all reasonably relevant evidence in front of the factfinder[.]"[12] Absent any indication that Mr. Park would exercise his subpoena power, Mr. Veralrud subsequently emailed Mr. Sandy Weintaub, Director of Student Conduct and Community Standards at the University. He stated, "As you may be

---

[8] See Exhibit D.
[9] Id.
[10] Id.
[11] Id.
[12] See Exhibit E.

aware, Doug Park has denied (I think) our request to issue subpoenas for various relevant witnesses as provided for by rule…I'm requesting that you ask the University to use the subpoenas requested in fulfilling [the obligations of another rule]. If you don't agree and without waiving any claim of right to the subpoenas, I then request that notices of required appearance be sent to those same witnesses and that we be able to submit the request to the chair so he can consult with you."[13] The other attorneys joined in this request. Without the process required, Mr. Austin signed the choice form one week later on June 3, 2014.

As this colloquy demonstrates, the choice was not a choice at all. It was prejudging, cornering, and compelling of three teenagers by a powerful university bent on providing no due process.

### III.

**This Improper Series of Events Require This Case to Move Forward to the Discovery Phase.**

By the end of this three (3) week game of hide-the-ball on the part of the University administration, the Court is left with more questions than answers.[14] *What email communications occurred between administrators around this time? What, if any, counseling or intervention was provided to guide the boys? What percentages of cases go to panel and what percentage to hearing? What if any efforts are made on the part of the school to influence this choice? Was the choice design a willful attempt to evade the mandates of Due Process? What percentages of claims proceed to each stages of the "process" and what percentage of those claims result in findings of "guilt"? Was this information available to the students in any way? More specifically, has there ever been a single case in which group sexual activity occurred between three (3) female and one (1) male student and the university proceeded on a lack of*

---

[13] See Exhibit F.
[14] These questions and answers directly implicate our Title IX claim.

*explicit consent theory on behalf of the male student? Has there ever been a single case in which a male student claimed of lack of explicit consent and had his claim treated in the same manner?*

Furthermore, the discovery process would reveal how the named defendants, who run the University, influenced the panel after the University committed itself publicly to the side of the accuser so quickly after the alleged incident.[15] These lingering questions are why motions to dismiss at this stage are governed by a lenient pleading standard, which allow cases to proceed to discovery. In this context, even greater leniency should be applied. Unlike, by comparison, a 42 U.S.C. § 1983 Civil Rights case where Plaintiffs are typically armed with police reports, case files from criminal cases, Freedom of Information Act (FOIA) results, and media-generated information to assist in drafting a complaint, here, Plaintiffs are left with the black box that is the University's improper process.

## **CONCLUSION**

Under the circumstances of the case, the boys with their education, scholarship and future in the balance were left with effectively no real choice and forced into a more deficient process. The issue of whether they had a knowing and voluntary choice between the procedures is purely factual and cannot be decided at this stage. This leaves the Court to evaluate, not the decision of the panel, but rather the deficient process of reading police reports into the record.[16] As the Court is aware, police reports have long been held as inherently unreliable documents when determining culpability, especially in the context of domestic allegations without an iota of

---

[15] The concerns of the defendants over discovery also miss the mark. This will not lead to endless litigation. It will lead to positive change.

[16] This is especially true given the District Attorney's office's decision to decline prosecution after having an opportunity to evaluate these reports. The University's process of accepting the police report, while knowing that there had to be concerns regarding its veracity, is problematic. It is curious that the university would receive the untested police reports knowing that the District Attorney's office certainly did not give them credence and without any explanation as to why.

corroboration.[17]  The University did not care. Fortunately, the Constitution and applicable law demand more.

      We have met our pleading requirements and this case should proceed.  We thank the Court for its continued courtesies.


Dated: Tuesday, August 16, 2016         Respectfully submitted,


By:
    s/Alex Spiro
    Alex Spiro, Esq.
    Brafman & Associates, P.C.
    767 Third Avenue, 26th Floor
    New York, NY 10017

*Attorney for Plaintiffs Dominic Artis and Damyean Dotson*

---

[17] Fed. R. Evid. 803(8) provides, in pertinent, that reports of public offices setting forth matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, criminal cases matters observed by police officers and other law enforcement personnel, are exceptions to the rule precluding hearsay unless the sources of information or circumstances *indicate lack of trustworthiness* (emphasis added). Fed. R. Evid. 803(8); Hill v. Rolleri, 615 F.2d 886 (9th Cir. 1980) (the trial court committed harmless error when admitting a police report containing statements made by one driver in an automobile accident case); United States v. Pena-Guitierrez, 222 F.3d 1080 (9th Cir. 2000) (law enforcement reports conducted in a criminal investigation are inadmissible under Rule 803(8)).

## **CERTIFICATE OF SERVICE**

I, Alex Spiro, hereby certify that, on the date set forth below, I served a copy of the foregoing memorandum upon the following counsel of record via this Court's mandatory Electronic Case Filing system:

Attorney/Defendants
Michelle B. Smigel
Michelle Barton Smigel, P.C., OSB No. 045530
michelle.smigel@millernash.com
Michael Porter, P.C., OSB No. 003560
mike.porter@millernash.com
Phone: 503.224.5858
Fax: 503.224.0155

Dated: Tuesday, August 16, 2016        Respectfully submitted,

s/Alex Spiro
Alex Spiro, Esq.
Brafman & Associates, P.C.
767 Third Avenue, 26th Floor
New York, NY 10017

s/Brian Michaels
Brian Michaels, Esq.
259 East Fifth Ave.
Eugene, OR  97401

*Attorney for Plaintiffs Dominic Artis and Damyean Dotson*